Ashe, J.
observed, that at the time of our separation from Great-Britain, we were thrown into a similar situation with a set of people ship-wrecked and cast on a maroon’d island—without laws, without magistrates, without government, or any legal authority-that being thus circumstanced, the people of this country, with a general union of sentiment, by their Delegates, met in Congress, and formed that system or those fundamental principles comprised in the constitution,—dividing the powers of government into separate and distinct branches, to wit, the legislative, the judicial and executive, and assigning to each, several and distict powers, and prescribing their several limits and boundaries: this he said without disclosing a single sentiment upon the cause of the proceeding, or the law introduced in of it.
Curia advisare vult.
*49 At May term, 1787, Nash’s motion was refused, and produced very lengthy debate from the bar.
Whereupon the Court recommended to the parties to consent to a fair decision of the property in question, by a jury according to the common law of the land, and pointed out to the defendant, the uncertainty, that would always attend his title, if this cause should be dismissed without a trial; as upon a repeal of the present act (which would probably happen sooner or later) suit might again commenced against him for the same property, at the time when evidences, which at present were easy to be had, might be wanting. But this recommendation was without effect.
Another mode was proposed for putting the matter in controversy on a more constitutional footing for a decision, than that of the motion under the aforesaid act. The court then, after every reasonable endeavour had been used in vain for avoiding a disagreeable difference between the Legislature. and the judicial powers of the act, at length with much apparent reluctance, but with great deliberation and firmness, gave their opinion separately, but unanimously for overruling the aforementioned motion for the dismission of the said suits.
In the course of which the Judges observed, that the obligation of their oaths, and the duty of their office required them in that situation, to give their opinion on that important and momentous subject; and that notwithstanding the great reluctance they might feel against involving themselves in a dispute with the Legislature of the state, yet no object of concern or respect could come in competition or authorize them to dispense with the duty they owed the public, in consequence of the trust they were invested with under the solemnity of their oaths.
That they therefore were bound to declare that they considered, that whatever disabilities the persons under whom the plaintiffs were said to derive their titles, might justly have incurred, against their maintaining or prosecuting any suits in the Courts of this state; yet that such disabilities in their nature were merely personal, and not by any means capable of being transferred to the present plaintiffs, either by descent or purchase; and that these plaintiffs being citizens of one of the United States, are citizens of this state, by the confederation of all the states; which is to be taken as a part of the law of the land, unrepealable by any act of the General Assembly.
That by the constitution every citizen had undoubtedly a right to a decision of his property by a trial by jury. For that if the Legislature could take away this right, and require him to stand condemned in his property without a trial, it might with as much authority require his life to be taken away without a trial by jury, and that he should stand condemned to die, without the formality of any trial at all: that if the members of the General Assembly could do this, they might with equal authority, not only render *50 themselves the Legislators of the state for life, without any furth selection of the people, from thence transmit the dignity and authority of legislation down to their heirs male forever.
But that it was clear, that no act they could pass, could by any means repeal or alter the constitution, because if they could do they would at the same instant of time, destfoy their own existence as a Legislature, and dissolve the government thereby established. Consequently the constitution (which the judicial power was bound to take notice of as much as of any other law whatever,) standing full force as the fundamental law of the land, notwithstanding the act on which the present motion was grounded, the same as must of course, in that instance, stand as abrogated and without an effect.
Nash’s motion was overruled.
And at this term the cause was tried.
Both the plaintiffs and the defendant admitted the title of the of miles to have been in Samuel Cornell, Efq. at and before the tin when the independence of this state commenced.
The case appeared to be this: Mr. Cornell, once an inhabitants of Newbern, leaving his family, together with the premises in question, and a variety of property in this town, took shipping on the 19th of August 1775, and went to Great-Britain, where he continued till some time in the latter part of the year 1777, when he came to New York, then occupied by a British garrison; and as British subject came from thence and arrived in Newbern, on the 11th of December 1777, and under the protection of a British flag.
His principal design, in coming to this state at that time, was to take his wife and family with him, to reside under the British government, if he did not find our new government agreeable to his wishes. Not being pleased with the appearance of things here, and thereupon preparing to leave the state, and to carry with him his wife and family, he executed on board the vessel he came in, a decree to his daughter, one of the plaintiffs (under which they claim) for the premises in question, on the 19th of December 1777.
This deed for the purpose of execution had been handed to him without a date, and being asked what date he chose it should bea he hesitated and said he would look at the copy of a bill which was then in his possession, which bill he understood to be on its passage in the legislature, for confiscating the property of all persons of his description, who should not within a limitted time come into the state, and be made citizens thereof, which bill afterwards in the same session passed into a law. After looking at the aforesaid copy of that bill, he chose that the deed should bear date on the 11th in the same month, being the day he arrived in the harbour of Newbern; which deed was accordingly dated that day. After which Mr. Cornell returned with his family from this state, and from *51 thenceforth lived and died a British subject, under the British government.
The Court, Ashe J. Spencer J. and Williams J. gave their opinion seriatim, but unanimously.
They observed that the cause turned chiefly on the point of alienage in Mr. Cornell. For this gentleman having from his birth to the time of his death, been always a British subject, and having always lived under the British government, he owed allegiance to the King of Great-Britain, and consequently was never a citizen of this, or any other of the United States, nor owed allegiance thereto. For when here, at the time of the transation aforementioned, he was under the protection of a British flag. That he was therefore, in contemplation of law, as much an alien, and at the time of executing the deed; and, from the time of our independence as much an alien enemy, as if we had been a separate and independent ration, for any number of years or ages before the commencement of the war which was then carried on.
That it is the policy of all nations and dates, that the lands within their government should not be held by foreigners. And therefore it is a general maxim, that’the allegiance of a person who holds land ought to be as permanent to the government who holds it, as the tenure of the foil itself. That therefore by the civil, as well as by the common law of England, aliens are incapacitated to hold lands. For that purpose the civil law has made the contracts with aliens, void. The law of England, which we have adopted, allows them to purchase, but subjects them to forfeiture immediately; and does not allow an alien enemy any political rights at all.
That the premises in question upon these invariable principles of law, could not from the time our government commenced, have been held by Mr. Cornell, because that in consequence of his owing no allegiance to the state, he had no capacity to hold them, and according do the better of the law of the land, they must have consequently been forfeited to the sovereignty of the state. That the act of confiscation, in which Mr. Cornell was expressly named, and more particularly the act which especially directed the sale of the very premises in question, must have been at least as effectual in vesting them in the state, as any office found, according to the practice in England can be, for vesting any forfeited property in the King.
That the circumstances and limitted priviledges of persons who were sent out of this state under a particular act of our General Assembly, are not applicable to this case. That the case in Vattel, of the majority of the inhabitants of any country deliberately dissolving their old government, and setting up a new one, is neither in reason, nor in the most essential circumstances, anyways similar to this case. That Calvin’s case reported in Coke, does by no means reach the leading and characteristic circumstances of this case.
The jury found a verdict for the defendant.
Iredell, Johnston, and Davie for the plaintiffs. Moore and Naf for the defendant:
*** On the decision of this cause, twenty-seven others depending in the same court, and subsisting upon similar, or less substantial grounds, were all swept off the docket, by nonsuits voluntarily suffered.
Ex relatione Spencer, J,